Good morning, Your Honors. May it please the Court, Frank Becchione appearing on behalf of Appellant Claimant Christopher Isley. This is a case which deals with the emergency doctrine as enunciated in United States v. Cervantes in this circuit. The issue boils down to a warrant following the completion of a protective sweep under the emergency doctrine violates the Fourth Amendment. The question answers itself. If you have a warrantless entry or search of a residence following the completion of a protective sweep under the emergency doctrine, the strict and narrow exception of the emergency sweep has ended. And I think the facts of this case indicate quite plainly that Officer Guthrie arrived at a residence, there was a 911 call of a shooting, the injured party was at the front door, Officer Guthrie talked to a neighbor for a brief couple of minutes and then decided to do the protective sweep of the residence. The government relies upon the emergency doctrine allowing the officer to go in with fellow officers to do the sweep. Officer Guthrie testified that he was trained in protective sweeps. He did a circular protective sweep of the residence. He hit every room within the residence. He turned on the lights in the residence. In every room he looked where anyone could be hiding. He determined that there were no other injured parties in the residence. Keep in mind that when he arrived at the residence, he had been told that the suspects, the assailants, had fled. He was given a description of the vehicle and was told there was only one injured party. That one injured party was left at the front door as he went in for the protective sweep. During a search of the house, during the sweep, he finds no other injured parties, no other suspects, no other reason to fear that there is a danger either to the officers conducting the sweep or to any of the residents of the home. Does your argument depend on there being a complete break in the presence of the officers inside the house? It does not, because my argument depends on the fact and the law that a protective sweep under Cervantes and under other Ninth Circuit decisions is narrow in scope and it's limited to the reason for the emergency doctrine, which takes us outside of the standard Fourth Amendment warrant requirement. If it doesn't, if it doesn't Once the protective sweep ends, I'm sorry, Your Honor. Well, if I might interrupt, because how do you reconcile your point with Russell? Because in Russell, essentially what happened is he had a protective sweep and then the police engaged in a far more extensive search, and we said that fell under the doctrine. Well, in Russell, the court becomes very, the majority becomes very concerned with the fact that there's continued confusion. There was a call that someone had shot himself in the foot. The 911 officer hears other people talking in the background. Then they're of Hines that is injured. Then a name is given that Russell is injured. So when the officers arrive at that residence, they don't know how many people are in the residence and they don't know how many people are injured. They see Russell hopping out to a vehicle and leaving with two women, but they don't know what's inside that residence at that point in time. In other words, when they went in for the protective sweep, there was objective facts indicating the first prong of Cervantes was met, i.e., there could be a danger to the officers, there could be danger to people still in the residence, or there could still be injured parties inside the residence. Sure, but once they get in there, then they start looking through drawers. They start conducting a more traditional investigation rather than a protective sweep. Now, that gets back, I think, to Judge Campy's question. If there's no break, I mean, if there's a break, I think your case is stronger, but if there's no break and the district court seemed to think there was no break, then going back in and conducting a more thorough search may not be objectionable under Russell. Well, I think it is, Your Honor, because I think the law is clear that once any of the prongs of Cervantes are gone, either the objective first prong that there's an immediacy of danger or the subjective second prong, which comes into play here, that the subjective intent of the searching officers went from the immediacy of the danger to search for the other cases because there was still objective facts indicating an emergency may still be existent in Russell and in Stafford and in Pow Pow. But in this particular case, when Officer Guthrie leaves the residence, the protective sweep is over. There's a bright line that we can point to in this case that when Guthrie leaves the residence, leaves a woman inside, talks to the neighbor on the front lawn for 15 minutes, there is no concern of danger or immediacy of explosion, of fire, anything that we can point to in the other cases because they know that is a safe, secure location. There is now no longer a combined immediacy criminality search taking place when Guthrie goes back in. You now have a sole purpose of the officers to search for evidence of crime. That doesn't exist in any of the other cases. There's always an objective argument that can be made, that they have not really diffused the emergency situation. In this case, the emergency situation was totally diffused. Whether officers 1 or 2 remained in the living room is irrelevant. What's relevant is that prong 1 of Cervantes was gone. There was no more immediacy of emergency. And prong 2, I say very importantly, was gone. That is the subjective motivation of the officers was to search for evidence of crime. Now, if the officers just sat in the living room after the protective sweep is over and they sat there for a half an hour saying, well, what are we going to do now and decide, well, let's, there's something fishy here. We think this guy was involved in some type of criminal activity. Let's search the house now for evidence of criminal activity. That clearly wouldn't come under the Cervantes emergency doctrine. So just staying in the house can't protect, can't eviscerate the Fourth Amendment because now you have a continued unlawful presence of the officers. In fact, what they're basically trying to carve out here is an emergency protective sweep continued occupancy exception. A continued occupancy after the first two prongs of Cervantes are gone does not rise to the exception. It's a continued illegal presence. And I'm Are you conceding for the point, for the purpose of this argument that there was continuous occupancy? No, I'm not. I think the evidence is unclear on that, and I think circumstantially the evidence is more clear that when Officer Guthrie left the residence that Officer Billman was outside the residence talking to Mr. Isley, who was standing there waiting for medical treatment. We don't really know for sure because the district court just said, well, I'm going to assume all the facts as Isley offers them. So, I mean, as I read that, the district court is assuming a break in occupancy. Yes. But we don't know because they didn't make any findings. That was kind of an assuming for purposes of decision. Well, I think there's a break in occupancy because I think logically if you take what the government is then attempting to use on the second entry into the residence, an overwhelming smell of marijuana, if you have officers continuing to occupy that home for approximately 20 minutes to a half an hour, no one reported a smell of marijuana in the residence. That tells me there were no officers in the residence or Officer Guthrie did not smell marijuana on the reentry. If we accept him at his word, no other officers came forward and said, well, we were sitting in that residence for 20 minutes to a half an hour. We smelled marijuana. There's no evidence of that in the record. But I submit that the breaking point is when the subjective intent of the officers change, prong number two of Cervantes. When their search is now primarily motivated to find evidence of crime, that's when the occupancy for the emergency doctrine ends because there is no other reason for them to remain in the residence. Well, I think what you may need and you may have, according to your argument, is not a primary subjective intent but a sole subjective intent. It is clear it is the only subjective intent. He testified to it both at the deposition and at the hearing. If they have some reason that's legitimate to stay in, then it really doesn't matter if they have another intent. Then maybe it's arguable and you could defer to a court's ruling. There is no evidence of anyone either reentering or remaining in that residence for an emergency doctrine reason. In fact, they concede they went back in to search for evidence of criminality. Officer Guthrie, his whole focus after he left that residence is what is Isley up to, not is there still a danger in the residence. That never enters his mind again. And once he's outside of that residence, he's to have the rest of his other officers leave the residence as well and either wait for a valid warrant or decide what they're going to do at that point in time, not just reenter and violate the Cervantes exception to search for evidence of crime. Do you want to reserve? Yes. Thank you. Good morning. Police and Court. My name is William Wood. I'm arguing on behalf of the United States government. The government has argued consistently throughout this case that the Chula Vista Police Department had an uninterrupted presence in the Isley residence during the period of time that's at issue here. We're talking about a period of time that's not going to exceed much in length between 15 or 20 minutes. That's the time we have to present to the court today. How do we deal with the district court's order in that respect, though? I find that a bit puzzling because the district court has assumed, it seems to me for the purposes of argument, that there was a break. So how can we reach back and unassume that for the purposes of this argument? I don't agree that – I read Justice Jones' opinion and saw that he acknowledged the government's arguments but then chose to analyze the case under the emergency doctrine Cervantes and Tyler and those – that set of cases. But I don't think that the court is assuming that there's a clear break in Chula Vista's presence inside that residence. For one thing, it's a shooting crime scene and the victim himself is down in the threshold of this residence. And the testimony at the deposition, at the hearing, is that the officers are in – they're not standing outside the front door. They're inside the front door by a matter of feet. Mr. Isley is inside the threshold of his residence. During the period of time, the biggest chunk of time that's at issue in this case, there is an officer with Mr. Isley inside the residence. Well, he's – I mean, there's no argument about the protective sweep, as I understand it. So whether they're in at the time that they're dealing with his wound or not doesn't matter too much because after that, they sweep the house, don't they? Sergeant Guthrie described this crime scene as – he was very specific about not trying to think about it in a linear progression. He didn't think about it that way. He thought about it more as an onion. And it's very important to draw the – because this case is so factually determined, it's important to look at it, the context of the events. It's 10 o'clock at night. It's the middle of January. There's a shooting victim down inside his residence. There's a police helicopter responding overhead. They don't know who the shooters are. They don't know where the shooters are. They don't know what the motivation for the shooting is. There was some report that possibly suspects were fleeing. Sergeant Guthrie's report suggested that they had discounted that by the time they arrived at the residence. They approached the residence believing that it was very possible or even likely that the shooters were still there on the premises, in the neighborhood, inside the house. There's a detached garage. It is utter chaos for the first 15 or 20 minutes. And Sergeant Guthrie is the coordinator of this crime scene. Twelve or 13 Chula Vista Police Department officers, two-thirds of the night shift available to that agency at that time, are responding. They're sealing – they have an outer perimeter. They have an inner perimeter. They're approaching their residence on foot. They're blocking possible suspect paths out of the neighborhood. And there's just an awful lot going on. They have to balance those crime scene concerns with the health of Mr. Isley. They don't know if he's been shot through the femoral artery. And that was Sergeant Guthrie's testimony. Is he going to bleed out on the spot? Do I need to call out a homicide detail? All the while, balancing officer safety concerns, are we going to get shot? But they finish – I accept what you say, and so far, so good. But then they do a sweep. The officers are convinced that they have a secure scene. And then they go back in, whether they're in the threshold or whether they're – there's at least some sort of a break between the protective sweep and the more thorough investigatory sweep, wouldn't you say? Sergeant Guthrie testified that he left Ms. Dionna inside the residence with other officers, went outside to contact Mr. Moreno, because he didn't – whom he believed to be a witness, and he didn't want that person to flee, and coordinated some of the crime scenes that I've described for you just now. But he testified that at that point in time, he doesn't know if it's about gambling. I mean, they're beginning to wonder, what is this shooting about? He doesn't know why, but they know that it's secure. So at that point, isn't it converted into a crime scene investigation as opposed to a scene in which you're – the police is – or the police officer performing a community caretaking function? That isn't my impression from the record, because Sergeant Guthrie testified that he – until he – until those – he specifically testified, until we have the shooters in hand or have some clear sense of what happened here or where they are, we're urgently concerned with our safety and with the safety of this perimeter and the safety of the community. And he testified – Right. But then they smell the odor of marijuana. And that has little or nothing to do with safety, right? He has Ms. Dionna inside the residence. I'm going to come to that, if I may. Sure. He has a shooting victim down in the threshold of the house, just – and he has a witness outside. He says, I don't know if it's gambling, I don't know if it's narcotics, I don't know if it's alien smuggling, and I don't know if it's a love triangle. He hasn't discounted the possibility that Ms. Dionna herself might be a suspect or that Mr. Isley shot another man because there was some sort of a personal issue at stake as police officers are naturally extremely cautious under those circumstances. He – after 10 to 15 minutes at the outside, he walked back into the house and he said he immediately noticed the overwhelming odor of marijuana. He said if he had noticed it the first time he was in the house, he didn't register it. Maybe his adrenaline was pumping too hard, something – I don't know why he didn't register it. But he did register it immediately, and the first thing he did was ask Ms. Dionna for consent to search the So the – Go ahead. No, the – Stafford, Russell, they discussed looking at these crime scenes in terms of the totality of the circumstances, and the appropriate way to approach it is to give the police officers – is not to try to draw a bright line through this crime scene about when their subjective motivations shifted from trying to discover whether the urgency had abated in the search and whether they had shifted gears to trying to solve a crime, a shooting crime. At some point – they're making very quick decisions under very taxing circumstances with – and he stated in his testimony without – with deliberate hyperbole that he had about 5,000 things going at one time. He's the crime scene coordinator. He's trying to balance all of these concerns. But he was quite sure that he was – that his concern for officers' safety and his concern for trying to determine what motivated the shooting was about reaching a comfort factor for himself and for the team of officers that he's got out there that are trying to ensure the public's safety. I thought – Go ahead. Sorry. Well, I just – what did he – what testimony supports the view that he was concerned with safety? No, he testified that at page 51 of the – from – in the government's excerpt of records, that's the transcript page Mr. Guthrie offers on page 46. He testified that after he finished discussing – or having that short second contact with Mr. Moreno, that I was more concerned that I didn't have a reasonable, clear idea as to what motivated the shooting. And then, again, at page 24 of the clerk's excerpt, or page 19 of the actual transcript page, he said, until we knew that the people are out of the area or we have them in custody, then there's always a perceived threat to the officers and to the community. Sergeant Guthrie had not reached a factor where he felt comfortable with that crime scene. There – it's – there's still a very dramatic tactical approach going on out there at that crime scene. There are – there are perimeters, there are levels of perimeters, and they haven't figured out what exactly happened. And until they reach that comfort factor, they feel that the public safety and the officer's safety is dramatically at issue. Well, there I get back maybe to Judge Thomas's point that we don't have a lot of findings on this testimony. I – I suppose there's not much other evidence of his subjective intent, I suppose, other than his testimony. I agree that under – that under United States v. Stafford and the Cervantes analysis that we're – we're concerned with Sergeant Guthrie's subjective motivation as the crime scene evolves through time. If you take it in slices, five-minute slices. And we want to determine when he – at that point in time, when he – when he's coordinating, he's going back and forth from this crime scene. At some point in time, in – in that coming and going, we're – we're concerned with what his subjective intent was. Was he – did he suddenly shift gears and decide, I'm going to investigate the crime, or is he still concerned with trying to resolve the shooting and the motivations for the shooting because he's concerned with officer safety? Well, even the testimony you mentioned, it can be read two ways. I mean, I wasn't sure what the motive for the shooting was. Well, I suppose that you can parlay that into a concern for the officer's safety on the spot, but you can also say it's just pure investigation. The – the analysis is from subjectively looking at Sergeant Guthrie at that particular moment in time, when he walks back into the residence, he – he – he's not going back in to conduct a crime scene investigation. At that point in time, the district court points out that at that point in time, he hadn't yet smelled marijuana. He hadn't gone back in thinking, I'm going to do – I'm going to start looking through drawers and looking through closets. He really just went back inside to make contact with Ms. Diona to resolve some issues about the motivation for the shooting so that he could determine what – how to direct this emergency response that he's coordinating out there at that crime scene. There are other officers inside the residence, and the – the event should be looked up under – under Michigan v. Tyler as a continuum. It's really not a second entry for purposes of search. It's a continuation of the first entry, Sergeant Guthrie's first entry into the residence, and it's one that's preceded by other officers being in the – in the house during that period of time. Even if they're just inside the front door with Mr. Isley, there was always a Chippewa Vista police officer inside the – inside. How do you square this with Mincy, though? I mean, Mincy seems to me to be saying that there's no crime scene exception to the Fourth Amendment requirements, that once – once the police have finished their community care taking – care taking function and it turns into a crime scene, then you – then the usual rules apply. So if we – if we take the district court at its word, at least for assumptions, you have a – a break in the action, the officer goes back and he smells marijuana, and then people do – the officers do a thorough search. After getting consent. Yes, yes. Right. That's hard to – hard to reconcile with – I mean, if the consent – the district court didn't rely on the consent particularly, so we're up here on the emergency doctrine. I mean, it may well be that it comes – comes back for further fact-finding, but don't we have to take the district court at its word and – and apply Mincy? The district court, in applying Mincy and – and going through that analysis, found that the emergency had not abated during this 15-minute period of time, a very short window of time. Where was that – where was that find? The court finds that Officer Guthrie's second entry was within the scope of its investigation into the emergency, and the court finds that there is no indication that the primary motive was to arrest or to seize evidence at the time that Sergeant Guthrie reentered the residence. Yes, but he did – there was no finding that the emergency had abated. It was a – it wasn't applying the facts to the law, saying that under the emergency doctrine we think it applies. It didn't say that – the district court didn't say that the emergency was still present or had not abated. No, I agree. I'm assuming that – when I – when I read that – that finding from the court, I'm assuming that the court finds that in this 15-minute slice of time that the emergency is really ongoing, and there was an extensive discussion of the factual basis that we – that we laid out for the court here today. Further questions for the government? I thank the court. Thank you. We'll give you two minutes for rebuttal. Thank you. There's both prong one and prong two of Cervantes, the objective test, whether the emergency had in fact abated, looking objectively at the facts. And we know that the officers had conducted a thorough sweep, a protective sweep of the residence, found no emergency present, no suspects present, no injured parties present, left a young woman and her child in the residence, with or without officers, we're not sure, left the injured party at the front door of the residence, standing, talking to Officer Billman, left the neighbor, Mr. Moreno, 10 to 15 feet from the front door for a 15-minute interview. There is no objective indication that there was a perceived continuing threat. The threat was not inside the residence, if there was a perceived threat. If there was a concern of the officers that the assailants were going to come back, they weren't in the residence. We know they're not in the residence. There is no emergency in the residence. If there was concern of these officers, everyone should have been put in patrol cars, the house should have been surrounded. That didn't happen. We have a very casual interview on the front lawn. We have the young lady and her child still in the residence. This isn't like the cases where there's a possible situation of explosion, of danger. This is diffused. It has to be diffused because everybody is still acting very calmly after the protective sweep is over. Excepting what you say is true, how do you reconcile Tyler and Mincy? It seems to me that the district court relied on Tyler and implied that there was a right to investigate as part of a continuous course of action once the police had arrived. Well, Michigan v. Tyler and Michigan v. Clifford are both fire danger cases. If you look at Michigan v. Clifford, which relies on Tyler, it indicates that the officers can go back repeatedly to attempt to find the source of the fire or to stop it from rekindling, under administrative concerns, protection of the public and to investigate the cause of the fire. But once that investigation turns to a criminal investigation, i.e., we think the restaurant owner torched his restaurant. Michigan v. Tyler and Michigan v. Clifford both say you now have a traditional Fourth Amendment issue. It's no longer an administrative fact-finding situation. Now you need a traditional Fourth Amendment warrant to go back in the residence, into the establishment to look for evidence against the owner with regard to the cause of the crime. They actually discuss that. And under Mincy, this is the crime scene investigation. Once again, you need a warrant, especially here. And if Your Honors would look at the factors enumerated on page 12 of our opening brief, the suspicions of Officer Guthrie were heightened by the location of the bullet hole, the lack of cooperation by Eiseley, the fact that Eiseley called his neighbor and not the police, the inability of Eiseley to provide a description of the intruders, the fact that Eiseley had an expensive Lexus in his driveway with no apparent means to afford it, and that the neighbor, during that 10 to 15 minute interview on the front lawn, said you might be on the right track when you're checking out his Lexus. That's when Guthrie goes back in to figure out what's Eiseley up to. And he said it might have been alien smuggling, it might have been gambling, it might have been narcotics. This is no longer investigation of a crime scene. There never was a crime scene investigation. They didn't get a warrant for DNA, fingerprints, blood samples. The warrant is for evidence of crime. They shifted from a protective sweep slash crime scene, which still would need some sort of warrant once the sweep is over, to evidence of criminality directed against Mr. Eiseley. They need to go get a warrant. They can't go back in and search that residence once their suspicions are directed solely on Mr. Eiseley for criminality, because that takes them outside of the second prompt. They are now primarily motivated to search for evidence of crime, not to diffuse an emergency situation. I gather you're depending, and apparently the government doesn't contest the idea that if they went in improperly, the search consent after that is tainted. Correct. Correct. That would be a fruit of the illegal second search. Further questions? Thank you very much. The case just heard will be submitted. When we called the calendar, Mr. Herman had not arrived. I actually have arrived. All right. Very good. We'll hear our argument then in John S. versus County of Orange.
judges: Canby, Thomas, Conlon